GRIFFIN, J.
St. Johns Riverkeeper, Inc. [“Riverkeeper”] appeals the final order of the St. Johns River Water Management District [“the District” or the “Governing Board”] approving Seminole County’s application for a consumptive use permit [“CUP”]. *1052 Under the CUP, Seminole County [“Seminole”] is able to withdraw surface water from the St. Johns River in an amount of 5.5 million gallons per day to be used for potable water and reclaimed water augmentation. We affirm as to all issues, except on the issue of Riverkeeper’s standing to challenge the District’s application.
Riverkeeper contends on appeal that the Governing Board incorrectly determined that it did not have standing under sections 120.569 and 120.57, Florida Statutes (2008), to challenge the issuance of the CUP. The District’s position is that Riv-erkeeper alleged “substantial interests” standing in its petition, but failed to prove at the hearing that it had such standing.
During the administrative hearing, the Administrative Law Judge [“ALJ”] heard testimony concerning Riverkeeper’s membership, mission, and activities. Neil Ar-mingeon [“Armingeon”], who is employed by Riverkeeper and whose title is “St. Johns Riverkeeper,” explained:
I believe currently we have 1,500 memberships. That is how we manage our database. And that equates to — some of the memberships are individuals. Some are businesses. Some are families. Individual groups. So I think the actual number of members would exceed that....
He also explained that Riverkeeper is based in Jacksonville and that it “work[s] with citizens up and down the St. Johns River.” When asked about the number of members in Seminole County, Armingeon said: “Currently we have 50. And one of the members is a group organization. But as I — so that organization has 280-plus members.” Also, when asked how many Seminole County members Riverkeeper had as of the time of the filing of the petition, Armingeon stated that his “recollection is maybe eight to ten.” Armingeon described Riverkeeper’s mission as follows:
Well, we have a long mission statement. But I — I always tell people that we can sum up what we do in two sentences. We believe that the St. Johns River is our community’s greatest natural resource. When I — the term — when I say “community,” I mean, all the communities that are blessed enough to be in this watershed. And the second thing I tell people is we believe what is best for the St. Johns River is best for the community-
With respect to activities of Riverkeeper’s members, Armingeon testified that members participate in a three-day ecological boat tour that runs from Jacksonville to Sanford, as well as a return tour that runs from Sanford to Jacksonville. There had been twenty of these trips involving more than 1,100 member participants. The route passes the proposed Yankee Lake withdrawal site. When asked about what takes place on the tours, Armingeon explained in detail about the numerous ways that the member participants study the river.
With reference to the testimony that the 5.5 million gallons per day [“mgd”] withdrawal of water from the St. Johns River would result in an increased nutrient load, causing an increase in the duration of algal blooms, Armingeon testified: “In 2005 there was a toxic blue-green algae blooming in the St. Johns River that extended from Lake George all the way north over 100 miles and actually through downtown Jacksonville out into the mouth of the river.” He described the effect:
And that summer the algae was so toxic you — basically the river was posted you couldn’t boat. If you did, it was very unpleasant. We have members who blue crab fish. You just — you couldn’t use the river. And I think that is an example of what — you know, when people’s use and enjoyment of the river is *1053 impacted by impairment of the river— the river is impaired....
When asked whether he considered the algal bloom “a manifestation of degradation of the system,” Armingeon answered: “Right. The river has exceed [sic] its assimilative capacity. We’re not — we’re assimilating or treating nitrogen phosphorus. You heard one of the ways that is visible to us as humans is algal blooms.”
In its recommended order, the ALJ found that “[t]he most prominent manifestation of nutrient imbalance in the St. Johns River is the increase in algal biomass, which can result in algal blooms” that “[w]ithdrawals of water from the River can increase residence time, which in turn has the potential to increase biomass in the water body.” He also found that “[a] substantial number of Riverkeeper’s members use and enjoy the River for recreation, boating, fishing, watching wildlife, and similar activities.” Nevertheless, in his final order, the ALJ concluded:
137. Riverkeeper alleges that Seminole’s proposed use will impact the use and enjoyment of the St. Johns River by a substantial number of Riverkeeper’s members. However, it was not proven that Seminole’s CUP will affect their use or enjoyment of air, water, or natural resources of the River.
The Governing Board adopted the ALJ’s recommended order in its final order, although it modified paragraph 137 by removing the language “air, water, or natural resources of.”
Section 120.569(1), Florida Statutes, provides in part that: “The provisions of this section apply in all proceedings in which the substantial interests of a party are determined by an agency....” Additionally, section 120.52(13)(b) defines “party” as “[a]ny other person who, as a matter of constitutional right, provision of statute, or provision of agency regulation, is entitled to participate in whole or in part in the proceeding, or whose substantial interests will be affected by proposed agency action, and who makes an appearance as a party.” Finally, section 403.412(5) speaks to the issue of standing under sections 120.569 and 120.57, Florida Statutes, providing:
(5) In any administrative, licensing, or other proceedings authorized by law for the protection of the air, water, or other natural resources of the state from pollution, impairment, or destruction, the Department of Legal Affairs, a political subdivision or municipality of the state, or a citizen of the state shall have standing to intervene as a party on the filing of a verified pleading asserting that the activity, conduct, or product to be licensed or permitted has or will have the effect of impairing, polluting, or otherwise injuring the air, water, or other natural resources of the state. As used in this section and as it relates to citizens, the term “intervene” means to join an ongoing s. 120.569 or s. 120.57 proceeding; this section does not authorize a citizen to institute, initiate, petition for, or request a proceeding under s. 120.569 or s. 120.57. Nothing herein limits or prohibits a citizen whose substantial interests will be determined or affected bg a proposed agency action from initiating a formal administrative proceeding under s. 120.569 or s. 120.57. A citizen’s substantial interests will be considered to be determined or affected if the party demonstrates it may suffer an injury in fact which is of sufficient immediacy and is of the type and nature intended to be protected by this chapter. No demonstration of special injury different in kind from the general public at large is required. A sufficient demonstration of a substantial interest may be made by a petitioner who es *1054 tablishes that the proposed activity, conduct, or product to be licensed or permitted affects the petitioner’s use or enjoyment of air, water, or natural resources protected by this chapter.
(Emphasis added).
In Agrico Chemical Co. v. Dep’t of Environmental Regulation, 406 So.2d 478, 482 (Fla. 2d DCA 1981), the Second District Court of Appeal addressed the issue of “substantial interest” standing, explaining:
We believe that before one can be considered to have a substantial interest in the outcome of the proceeding he must show 1) that he will suffer injury in fact which is of sufficient immediacy to entitle him to a section 120.57 hearing, and 2) that his substantial injury is of a type or nature which the proceeding is designed to protect. The first aspect of the test deals with the degree of injury. The second deals with the nature of the injury.
The Second District explained that the third-party challenger “must frame their petition for a section 120.57 formal hearing in terms which clearly show injury in fact to [protected] interests” and “ [i]f their standing is challenged in that hearing by the permit applicant and the protestants are then unable to produce evidence to show that their substantial environmental interests will be affected by the permit grant, the agency must deny standing and proceed on the permit directly with the applicant.” Id.
In Farmworker Rights Organization, Inc. v. Dep’t of Health and Rehabilitative Servs., 417 So.2d 753, 754-55 (Fla. 1st DCA 1982), the First District Court of Appeal found that for an association to establish standing under section 120.57(1) when acting solely as a representative of its members, it must demonstrate that “a substantial number of its members, although not necessarily a majority, are substantially affected by the challenged rule,” that “the subject matter of the challenged rule is within the association’s general scope of interest and activity,” and that “the relief requested is of a type appropriate for a trade association to receive on behalf of its members.”
Riverkeeper asserts that the Governing Board improperly mixed the issue of its standing to challenge the District’s issuance of the CUP with the merits of its challenge, as occurred in Peace River,/Manasota Reg’l Water Supply Auth. v. IMC Phosphates Co., 18 So.3d 1079, 1082 (Fla. 2d DCA 2009) and Reily Enters., LLC v. Florida Dep’t of Envt’l Prot., 990 So.2d 1248 (Fla. 4th DCA 2008). The Peace River and Reily courts each warned against mixing the issue of a party’s standing to challenge an agency’s action with the merits of the challenge. Peace River, 18 So.3d at 1084; Reily, 990 So.2d at 1251. Additionally, the Peace River court said that “if standing is challenged during an administrative hearing, the petitioner must offer evidence to prove that its substantial rights could be affected by the agency’s action.” Peace River, 18 So.3d at 1084 (emphasis added).
Riverkeeper established substantial interest standing. Among other things, the record contains evidence establishing that (1) Riverkeeper’s purpose and mission is the protection of the St. Johns River as a natural resource, and its principal activities are use and enjoyment of the River, (2) the 5.5 mgd withdrawal of water from the St. Johns will result in an increase in nutrient load, which will cause an increase in the duration of algal blooms, and (3) algal blooms can inhibit boating on the St. Johns River. Chapter 373 of the Florida Statutes addresses water resource protection and conservation, and the administrative proceeding was for the purpose of ensuring that Seminole’s CUP would not *1055 harm the St. Johns River or that any harm would be offset. Ultimately, the ALJ’s conclusion adopted by the Governing Board that there was no proof of harm or that the harm would be offset went to the merits of the challenge, not to standing. Palm Beach County Envt’l Coalition v. Fla. Dep’t of Envt’l Protection, 14 So.3d 1076 (Fla. 4th DCA 2009).[1]
AFFIRMED in part; REVERSED in part.
ORFINGER, J., and ROBERTS, C., Associate Judge, concur.

. Seminole asserts that "Riverkeeper’s argument is at best a moot point” because ‘‘River-keeper was determined to have standing in this proceeding pursuant to Section 403.412(6), Florida Statutes, and fully participated in the proceeding below.”